UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| KINDELLA WALNY,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>Defendant. | )<br>)<br>)<br>)<br>)  No. 4:14CV1684 RLW<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 1383(c)(3) for judicial review of Defendant's final decision denying Plaintiff's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. For the reasons set forth below, the Court reverses the decision of the Commissioner and remands for further proceedings.

### I. Procedural History

On August 22, 2011, Plaintiff protectively filed an application for Supplemental Security Income. (Tr. 16, 140-45) Plaintiff alleged that she became unable to work on June 1, 2010 due to diabetes, seizures, asthma, depression, bipolar disorder, learning disability, migraines, diverticulitis, polycystic ovaries, and obesity. (Tr. 86, 140) The application was denied, and Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 84-89, 92-94) On March 7, 2013, Plaintiff testified at an administrative hearing before an ALJ. (Tr. 40-82) On April 29, 2013, the ALJ determined that Plaintiff had not been under a disability since August 22, 2011, the date the application was filed. (Tr.16-29) Plaintiff then filed a request for review, and on August 13, 2014, the Appeals Council denied Plaintiff's request. (Tr. 3-5) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the March 7, 2013 hearing before the ALJ, Plaintiff was represented by counsel. Plaintiff's attorney listed Plaintiff's severe impairments as a seizure disorder, history of migraines, mental impairments, depression, anxiety, and history of reported panic attacks. The ALJ then questioned the Plaintiff, who testified that she was born March 8, 1980. She weighed 350 pounds and measured 5 feet 2 inches. She stated that she previously had carpal tunnel release surgery on both hands. However, the pain and limitation were returning. Plaintiff was divorced with three children, ages 15, 13, and 6. She lived in a house with her children and her boyfriend. Plaintiff received child support payments, and one child received SSI. Plaintiff had a driver's license, but doctors told her not to drive. (Tr. 42-48)

Plaintiff further testified that she received her GED and obtained pharmacy tech certification from a trade school. However, she never used her certification to work in that field. Plaintiff previously volunteered at her kids' school. During the hearing, Plaintiff began crying and explained that she had been a volunteer fire fighter since she was 15, and she used to do emergency management. However, she was unable to do anything now. Plaintiff stated that she also worked as a dispatcher. She previously drove fire trucks but could no longer do so because of her seizure disorder that was diagnosed in 2010. Plaintiff testified that she stopped working due to terrible headaches and leg pain. The bad headaches led to the seizures. Plaintiff was also having problems with her children at the time. Two of her children had cystic fibrosis. Plaintiff was in the hospital the night before the hearing with dehydration and kidney problems. The ALJ noted that Plaintiff's earnings did not show substantial gainful activity. However, Plaintiff believed she worked over 20 hours a week for over a year. (Tr. 48-52)

As a dispatcher and jailer, Plaintiff checked in new inmates and supervised them. She quit that job because of her condition. In 2000, Plaintiff worked at Little Caesar's pizza restaurant as an assistant manager. She made pizza, did the bank roll, and made the work schedules. She left that job because of her kids and their needs. (Tr. 52-54)

Plaintiff testified that she was unable to work due to seizures. The doctors were unable to find the right medication, and they had discussed a surgical procedure. Plaintiff underwent a spinal tap every 30 days, which was painful and made her sick. Plaintiff suffered from asthma and allergies, as well as sleep apnea. Dr. Choudhary treated for her migraine headaches and prescribed medication for the symptoms. She took Neurontin for the carpal tunnel syndrome and Imitrex and Amitriptyline for seizures. Plaintiff also had a prescription for Topamax. Plaintiff was diagnosed with diabetes. She testified that her legs recently became more swollen and painful. She wore Ted hose and kept her legs elevated. Plaintiff stated that she sometimes became mad and stopped taking her medications until her symptoms returned. (Tr. 54-62)

Plaintiff testified that she experienced migraine headaches daily. When the migraines were debilitating, lights and sounds would cause her to shut down, and she could feel her heartbeat in her head. These severe migraines occurred about twice a week, and she would go in her room and lay down. If her medication did not work, she would experience a bad seizure. Her two sons with cystic fibrosis were old enough to take their medications. When they were younger, they were frequently in the hospital. (Tr. 62-64)

Plaintiff stated that she had pain in her hands and in her lower back and legs on a daily basis. Her legs went numb when she sat, and a doctor advised her to elevate her legs. Plaintiff testified that she previously cleared out a wooded area for her wedding which did not occur. She

3

could carry a bag of groceries or a 12 pack of soda. She had difficulty remembering things and could not follow directions. Her children and boyfriend sometimes aggravated her. (Tr. 64-67)

Plaintiff's attorney also questioned Plaintiff about her impairments. Plaintiff stated that she had pain and swelling in her legs which made it difficult to stand. She experienced pain in her lower back and across her hips. She was able to stand longer if she leaned on something. She believed she could stand for 10 or 15 minutes before needing to sit down. Plaintiff had seizures once or twice a week, even though she took her medication regularly. During a seizure, Plaintiff passed out and shook. The seizures lasted less than a minute, and Plaintiff felt frozen and numb after. She returned to normal after a few minutes, but she was usually tired and had a headache. Plaintiff stated that the pressure on her head caused pressure on her eyes and affected her vision. (Tr. 67-71)

Upon further questioning by the ALJ, Plaintiff testified that her boyfriend and mother cooked the meals. Her mother did the laundry, and her kids made the beds. Plaintiff was able to pick up sometimes. She did the dishes while sitting in a chair. Plaintiff tried to shop for groceries. She went shopping with her mother, and the trip lasted a couple hours. Plaintiff's children helped carry in the bags. Plaintiff tried to help her children with homework. (Tr. 71-72)

A vocational expert ("VE") also testified at the hearing. The VE stated that Plaintiff's past work as a radio dispatcher at the city jail was sedentary work. However, her duties as a corrections officer was rated medium work. Pizza baker was also medium work, and her other duties at the pizza restaurant fit into the category of hostess and rated as light work. (Tr. 73-75)

The ALJ then asked the VE to assume a hypothetical individual with Plaintiff's past work who was able to perform light work, including standing and walking six hours during an eight-hour work day. The person could sit for two hours and should avoid concentrated exposure to

4

temperature extremes, dust, fumes, gases, odors, and smoke. Further, the individual could perform simple work and could interact appropriately with co-workers, supervisors, and the public. The person could sustain a routine and maintain attendance with normal breaks. Given this hypothetical question, the VE testified that the individual could not perform any of Plaintiff's past jobs. However, the person could work as a photocopying machine operator, coffee roaster helper and garment sorter. None of these jobs required driving. (Tr. 75-77)

The second hypothetical involved a person limited to performing sedentary work, which would also be simple, unskilled work. The person could stand and walk two hours and sit six hours with normal breaks. In addition, the individual could sustain a routine and interact appropriately with co-workers and supervisors. However, the person could have no more than casual or limited public contact. Further, the hypothetical individual needed to avoid concentrated exposure to temperature extremes, dust, fumes, gases, odors, and smoke but could otherwise sustain a normal eight-hour work day. The VE stated that the person could work as a surveillance systems monitor, a cutter and paster of press clippings, and a bonder semiconductor in the electronic component industry. If the ALJ added only occasional gross and fine manipulations and absenteeism three or more days per month, no jobs would be available. (Tr. 77-80)

The Plaintiff's attorney then asked the VE to also assume the hypothetical individual would need additional breaks and would be off task in the workplace in excess of 20 percent of the time. The VE answered that an employer would not accept a probationary employee being off task that amount. (Tr. 81)

In a Function Report – Adult, Plaintiff reported that on a typical day she woke up late, took her medication, and tried to get her kids ready for school. She usually had a seizure and a

5

headache after they left. She went back to bed and would get up between 1:00 and 2:00 in the afternoon. If she did not have another seizure, she tried to do chores or take a shower. When her kids returned home, she tried to help with homework, but she was usually in bed because the seizures made her tired. Plaintiff took care of her children and a dog. She had problems sleeping. Plaintiff needed reminders to take her medication. She was able to make sandwiches and frozen meals daily. She sat on the floor to do laundry, and she cleaned when her boyfriend was around. Plaintiff rarely went out because she had a seizure in her garden once. She was not supposed to drive. Plaintiff was able to shop for groceries and cleaning supplies twice a month. She could no longer participate in hobbies and interests. However, she spent time with her boyfriend, his mother, and his stepfather. Plaintiff reported that she needed reminders for appointments. Her family disowned her because she was hateful and mean. Plaintiff stated that her conditions affected her ability to talk, concentrate, and get alone with others. Her ability to pay attention and follow written and spoken instructions depended on whether she had seizures. Plaintiff further reported that she did not handle stress or changes in routine very well. (Tr. 184-92)

Plaintiff's friend, Verna Franks, also completed a Function Report – Adult – Third Party. Ms. Franks stated that she spent a lot of time with Plaintiff and helped with the cooking. Plaintiff was able to do dishes, laundry, and some cooking. However, she was unable to do anything if she had too many seizures. Plaintiff did not go outside much. She was able to shop for food, clothes, medication, and family necessities. Plaintiff could watch TV, use the computer, and go fishing so long as she was not having a seizure. Ms. Franks opined that Plaintiff's conditions affected all of her abilities because of the seizures. (Tr. 199-206)

6

### III. Medical Evidence

Dr. M. Choudhary treated Plaintiff between 2011 and 2013. (Tr. 608-11, 665-68, 742-56) She first saw Dr. Choudhary on May 12, 2008, and he assessed bilateral carpal tunnel syndrome, with the right worse than the left. (Tr. 751-53) On November 17, 2011, Plaintiff complained of seizures over the past two years. Plaintiff reported experiencing seizures three to four times a month, during which times she would pass out and her body would stiffen with not much shaking. (Tr. 755-56) On May 5, 2012, Dr. Choudhary performed an EEG, which was abnormal and consistent with a seizure disorder. (Tr. 749) Plaintiff underwent a spinal tap on August 23, 2012. She reported having seizures once or twice a month lasting a couple minutes. Plaintiff would pass out, her body would stiffen, and she would shake. She was tired after waking up. Plaintiff also reported daily headaches that were accompanied by nausea and a history of photophobia and phonophobia when severe. In addition, Plaintiff mentioned numbness and tingling in her hands and feet, as well as some memory problems. Dr. Choudhary planned to conduct a spinal tap and multiple sclerosis workup. (Tr. 665-67) On November 19, 2012, Plaintiff complained of a constant headache, pressure in her head, and blurred vision. Her pinprick sensation decreased in her feet and lower legs. Dr. Choudhary again planned to perform a spinal tap, as Plaintiff's headaches improved after the spinal tap in August, 2012. (Tr. 608-10)

Dr. Choudhary completed a Seizure Questionnaire on January 25, 2013. He described Plaintiff's seizures as generalized tonic-clonic complex partial seizures of variable duration with stress as a trigger. He did not know whether Plaintiff had any warning signs. After a seizure, Plaintiff should sit or lie down to avoid falling. In addition, Dr. Choudhary opined that the number of days of work missed per month would vary. Medications helped, but did not control, Plaintiff's seizures. (Tr. 803)

On that same date, Dr. Choudhary completed a Medical Source Statement – Physical. He opined that Plaintiff could lift and/or carry 50 pounds frequently and over 50 pounds occasionally. She could stand and/or walk for 2 hours continuously and 6 hours throughout the work day. Further, Dr. Choudhary opined that Plaintiff could sit continuously for 3 hours and could sit through an 8 hour work day for 7 hours. Plaintiff had no limitations on her ability to push and/or pull. She should never climb. With regard to environmental factors, Dr. Choudhary stated that Plaintiff should avoid any exposure to hazards and heights; moderate exposure to vibration; and concentrated exposure to extreme cold, extreme heat, weather, wetness/humidity, and dust/fumes. Plaintiff had variable pain from headaches which would require her to lie down or recline during a work day. Her pain medication could cause a decrease in concentration. (Tr. 800-01)

Also on January 25, 2013, Dr. Choudhary completed a Medical Source Statement – Mental. He stated that Plaintiff was moderately limited in her ability to understand and remember detailed instructions. She was also moderately limited in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances; sustain an ordinary work routine without special supervision; work in coordination with or proximity to others without being distracted by them; and complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Further, Dr. Choudhary opined that Plaintiff had moderate limitations in her ability to accept instructions and respond appropriately to criticism from supervisors and get along with co-workers or peers without distracting them or exhibiting behavioral extremes. With regard to adaptation, Dr.

8

Choudhary assessed Plaintiff as moderately limited in her ability to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. (Tr. 805-06)

On August 11, 2011, Plaintiff saw Angela D. Gower, P.A., to discuss her recent problems with uncontrolled migraines and seizures. Plaintiff had stopped taking all of her medications, and her symptoms became exacerbated. Ms. Gower noted that Plaintiff's mood, affect, and behavior were normal. She assessed bipolar 2 disorder; seizure disorder; migraine; diabetes; dyspepsia; hypertension; diabetes mellitus, type 2; and asthma. Ms. Gower counseled Plaintiff on the potential hazards of suddenly stopping her medications. Ms. Gower planned to slowly restart Plaintiff's medications, which included Celexa, Lamictal, Topomax, Prilosec, Advair, and albuterol. (Tr. 833-35) On September 6, 2011, additional medications included Trazodone, Zyrtec, Singulair, Diazepam, Symbicort, and Glucophage. (Tr. 376-80)

On December 7, 2011, Ms. Gower noted that Plaintiff had been referred to psychiatry the previous month but insurance constraints were slowing the process. Plaintiff complained of unchanged and uncontrolled anxiety and depression. On exam, Plaintiff exhibited tenderness in her right sacrolliac joint. She was alert and her mood, affect, and behavior were normal. Ms. Gower increased Plaintiff's Celexa dosage. (Tr. 499-504)

Plaintiff saw Sachin Thorat, M.D. on January 24, 2013 for complaints of seizures and headaches. Dr. Thorat noted a 2010 brain MRI that indicated a Chiari I malformation but was otherwise unremarkable. On physical exam, Plaintiff was cooperative and pleasant, with morbid obesity. Her mental status was normal, and she had normal light touch and pain in all four limbs. Dr. Thorat indicated that Plaintiff could have non-epileptic seizures and suggested inpatient EEG monitoring. Dr. Thorat instructed Plaintiff to continue seizure medications and avoid driving for

6 months after the most recent seizure with bodily loss of function. For her chronic daily headaches, Dr. Thorat prescribed Amitriptyline. (Tr. 906-15)

### IV. The ALJ's Determination

In a decision dated April 29, 2013, the ALJ found that the Plaintiff had not engaged in substantial gainful activity since August 22, 2011, the application date. Further, the ALJ determined that Plaintiff's severe impairments included degenerative disc disease ("DDD"); headaches; obesity; asthma; and allergies. The ALJ noted that Plaintiff's other alleged impairments of sleep apnea; seizures; diabetes mellitus; carpal tunnel syndrome; and bipolar disorder had no more than a minimal effect on her ability to work. Specifically, the ALJ found that Plaintiff's seizures were controlled when she took her medication as prescribed. Further, the pattern of treatment did not reflect a worsening. The ALJ noted that Plaintiff's carpal tunnel syndrome was only mild after successful surgery. With regard to sleep apnea, the ALJ found that conservative treatment showed significant improvement, and the record did not reflect significant complaints stemming from a sleep disorder. Further, the ALJ determined that Plaintiff's diabetes mellitus was not severe in that the record did not reflect a significant level of complications. With regard to Plaintiff's diagnoses of mental impairments, Plaintiff did not seek professional mental health care, and she merely received treatment through prescription medication, which had been generally effective. Thus, the ALJ found Plaintiff's bipolar disorder to be non-severe. (Tr. 16-21)

The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. After carefully considering the record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work except for

certain nonexertional limitations that reduced Plaintiff's capacity for sedentary work. Plaintiff could perform simple, unskilled work; could only stand or walk for two hours total in an eight-hour workday with normal breaks; could sit for six hours in an eight-hour day with normal breaks; could sustain a routine; could interact appropriately with co-workers and supervisors; could have limited social contact, defined as no more than casual or limited contact with the public; should avoid concentrated exposure to temperature extremes, dust, fumes, gases, odors, and smoke; and could sustain a normal eight-hour workday. (Tr. 21-27)

The ALJ further determined that Plaintiff was unable to perform any past relevant work. However, considering her younger age, at least high school education, work experience, and RFC, the ALJ found that jobs existed in significant numbers in the national economy that Plaintiff could perform. These jobs included surveillance systems monitor; cutter and paster, press clippings; and bonder, semi-conductor. Thus, the ALJ concluded that Plaintiff had not been under a disability, as defined by the Social Security Act, since August 22, 2011, the date Plaintiff filed her application. (Tr. 27-29)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. The Social Security Act defines disability "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that she has a severe physical or

11

mental impairment or combination of impairments which meets the duration requirement; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. *Id.*

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means less than a preponderance, but sufficient evidence that a reasonable person would find adequate to support the decision." *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). "We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because we might have reached a different conclusion had we been the initial finder of fact." *Buckner v. Astrue,* 646 F.3d 549, 556 (8th Cir. 2011) (citations and internal quotations omitted). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. *See Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir. 2000).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment. *Johnson v. Chater*, 108 F.3d 942, 944 (8th Cir. 1997) (citations and internal quotations omitted).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. *Marciniak v. Shalala*, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. *Id.* at 1354.

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the *Polaski*[1] factors and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount the testimony as not credible. *Blakeman v. Astrue*, 509 F.3d 878, 879 (8th Cir. 2007) (citation omitted). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. *Marciniak*, 49 F.3d at 1354.

## **VI. Discussion**

In her Brief in Support of the Complaint, Plaintiff argues that the ALJ failed to properly determine Plaintiff's RFC because the ALJ afforded greater weight to a treating neurologist's opinion yet failed to include all of the limitations set forth in that opinion. Plaintiff also contends that the ALJ failed to include all of Plaintiff's severe impairments at step two. Defendant asserts that the ALJ properly determined which impairments were severe and properly considered the

---

[1] The Eight Circuit Court of Appeals "has long required an ALJ to consider the following factors when evaluating a claimant's credibility: '(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

medical opinion evidence in formulating Plaintiff's RFC. The Court finds that the ALJ did not properly consider all of Plaintiff's severe impairments at step two, and the Court will remand this action for further proceedings.

"Step two of the regulations involves a determination, based on the medical evidence, whether the claimant has an impairment or combination of impairments that significantly limits the claimant's ability to perform basic work activity." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (citing 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii)). Under Social Security Ruling 96-3p, "an impairment that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities. SSR 96-3P, 1996 WL 374181 (S.S.A. July 2, 1996). "It is the claimant's burden to establish that [her] impairment or combination of impairments are severe." *Kirby v. Astrue*, 500 F.3d 705, 707-08 (8th Cir. 2007) (citation omitted). "[T]he burden is not a heavy one, and any doubt concerning whether the showing has been made must be resolved in favor of the claimant." *Morris v. Astrue*, No. 4:12CV189 LMB, 2013 WL 1282343, at *12 (E.D. Mo. Mar. 27, 2013) (citing *Kirby*, 500 F.3d at 707).

Here, the medical evidence demonstrates that Plaintiff's seizure disorder had more than a minimal effect on her ability to perform basic work activities. Plaintiff was regularly treated for seizures by neurologists. In 2012, neurologist Dr. Choudhary noted that Plaintiff's EEG was abnormal and consistent with a seizure disorder. (Tr. 749) Additionally, Dr. Choudhary described Plaintiff's seizures as generalized tonic-clonic complex partial seizures of variable duration with stress as a trigger. While the ALJ found that Plaintiff's seizures were controlled by medication, her treating neurologist noted that medications helped but did not control her seizures. (Tr. 803) Neurologist Dr. Thorat instructed Plaintiff not to drive for 6 months after her

most recent seizure with bodily loss of function. He suggested inpatient EEG monitoring. (Tr. 914) Both neurologists diagnosed a seizure disorder based on objective testing, as well as Plaintiff's subjective complaints, and advised precautions for Plaintiff based on this disorder. (Tr. 803, 914) Plaintiff reported to both Dr. Choudhary and Dr. Thorat that during an episode she could not move and was tired and confused afterward. (Tr. 906, 665) Plaintiff testified that after a seizure she needed to lie down because she was fatigued and had a headache. (Tr. 70)

Despite medical evidence from neurologists diagnosing Plaintiff with a seizure disorder and noting that medication did not control the seizures, the ALJ found Plaintiff's disorder was not severe. However, in light of the medical evidence and Plaintiff's subjective reports that she was tired, had a headache, was confused, and needed to lie down after, Plaintiff's seizure disorder would have more than a minimal effect on her disability. *See Morris*, 2013 WL 1282343, at *13. Thus, the Court finds that the ALJ erred by failing to properly evaluate the severity of Plaintiff's seizure disorder at step two. *Id.* Therefore, the Court will reverse and remand this case to the ALJ to allow the ALJ to consider Plaintiff's seizure disorder as a severe impairment and its effect on her RFC.

Plaintiff also argues that the ALJ failed to properly consider Plaintiff's mental impairments as severe at step two of the evaluation. Plaintiff specifically claims that the ALJ gave Dr. Choudhary's mental evaluation greater weight, yet only assigned mild limitations to Plaintiff's ability to sustain concentration, persistence, and pace. The Court notes that Dr. Choudhary found moderate, not mild, limitations to Plaintiff's ability to sustain a normal routine and maintain attention and concentration for extended periods. (Tr. 805) On remand, the ALJ should also re-evaluate the severity of Plaintiff's mental impairments and their impact on Plaintiff's RFC.

With regard to Plaintiff's diabetes and migraine headaches, the Court finds that Plaintiff points to no evidence in her brief in support of the complaint or reply brief demonstrating that her diabetes would have more than a minimal effect on her ability to work. Thus, the ALJ properly found Plaintiff's diabetes to be nonsevere. (Tr. 19) Further, the record demonstrates that the ALJ did consider Plaintiff's headaches to be severe and discussed the evidence related to "migraine headaches" in the opinion. (Tr. 24) Therefore, contrary to Plaintiff's assertion, the Court finds that the ALJ properly assessed Plaintiff's migraine headaches as severe.

In conclusion, the Court finds that the ALJ erred in determining that Plaintiff's seizure disorder was non-severe at step two. As such, the ALJ's RFC determination and the determination at step four are not supported by substantial evidence. *Morris*, 2013 WL 1282343, at *15. Thus, the Court will reverse and remand the case to the ALJ for further proceedings to consider Plaintiff's seizure disorder as severe and to re-evaluate Plaintiff's RFC in light of the medical and opinion evidence of record.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **REVERSED and REMANDED** to the Commissioner for further proceedings consistent with this Memorandum and Order. An appropriate Order of Remand shall accompany this Memorandum and Order.

Dated this 28th day of March, 2016.

*Ronnie L. White*

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**